

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-19-00243-CR

_____

MICHALE ALLEN, Appellant

V.

THE STATE OF TEXAS

---

On Appeal from County Criminal Court No. 4
Denton County, Texas
Trial Court No. CR-2018-02022-D

---

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

## MEMORANDUM OPINION

## I. Introduction

A jury convicted Appellant Michale Allen of misdemeanor driving while intoxicated (DWI), and the trial court assessed his punishment at 150 days' confinement.

During the trial, the trial court admitted evidence that Allen's blood tested positive for methamphetamine, and in a single point, Allen asks us to determine whether "a cursory statement from a hospital supervisor that a phlebotomist is qualified to draw blood render[s] that phlebotomist a 'qualified technician' under Texas Transportation Code Section 724.017."[1] *See Krause v. State*, 405 S.W.3d 82, 85 (Tex. Crim. App. 2013) (stating that a phlebotomist "is a technician who draws blood"); *Torres v. State*, 109 S.W.3d 602, 605 (Tex. App.—Fort Worth 2003, no pet.) ("Because a phlebotomist is not listed among those occupations which automatically qualify under [Section 724.017(a)], a phlebotomist must be proven to be 'qualified' before a blood sample he or she takes satisfies the statute.").

In part of its response, the State asserts that we need not reach this point because the evidence to prove Allen's intoxication—his driving behavior, his

---

[1]Section 724.017(a) lists the 5 categories of individuals who may take a blood specimen under Chapter 724 at the request or order of a peace officer:  a physician, a "qualified technician," a registered professional nurse, a licensed vocational nurse, or a licensed or certified emergency medical technician-intermediate or emergency medical technician-paramedic.  *See* Tex. Transp. Code Ann. § 724.017(a).

2

interactions with police officers, his performance on standardized field sobriety tests, and expert testimony about the effects of controlled substances on the human body—is sufficient to support his conviction. Because we conclude that the State is correct, we overrule Allen's sole point without reaching the merits and affirm the trial court's judgment.

## II. Discussion

In determining the likelihood that a nonconstitutional error[2] adversely affected the jury's decision, we review the record as a whole, including any testimony or physical evidence admitted for the jury's consideration, the nature of the evidence supporting the verdict, and the character of the alleged error and how it might be considered in connection with other evidence in the case. *Motilla v. State*, 78 S.W.3d 352, 355 (Tex. Crim. App. 2002). We may also consider the jury instructions, the State's theory and any defensive theories, whether the State emphasized the error, closing arguments, and even voir dire, if applicable. *Haley*, 173 S.W.3d at 518–19; *Motilla*, 78 S.W.3d at 355–56.

---

[2]We apply Texas Rule of Appellate Procedure 44.2(b), which requires us to disregard any nonconstitutional error that does not affect the appellant's substantial rights. Tex. R. App. P. 44.2(b). An error that has a "substantial and injurious effect or influence in determining the jury's verdict" affects a substantial right. *Haley v. State*, 173 S.W.3d 510, 518 (Tex. Crim. App. 2005); *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776, 66 S. Ct. 1239, 1253 (1946)). Conversely, an error does not affect a substantial right if we have "fair assurance that the error did not influence the jury, or had but a slight effect." *Solomon v. State*, 49 S.W.3d 356, 365 (Tex. Crim. App. 2001); *Johnson v. State*, 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

## A. Opening Statements

During opening statements, the prosecutor told the jury that the evidence would show that around 9 p.m. on July 26, 2017, an off-duty ambulance driver saw someone driving erratically on I-35E in Denton County. The ambulance driver called 911 and followed the vehicle. The police were dispatched and pursued the vehicle north across the county line to a gas station in Cooke County. At the gas station, the police put the driver, identified as Allen, through standardized field sobriety tests, and after his arrest, Allen consented to a blood draw, which revealed the presence of methamphetamine in his body.

The defense's opening statement focused on the fact that the jury would not hear from the ambulance driver. Defense counsel told the jurors that they would have to find Allen not guilty, even though they were "going to think he's guilty," because there would be no one to cross-examine who saw Allen operate the motor vehicle in Denton County.

## B. Evidence

The trial court admitted the recording of the 911 call into evidence. In that recording, the ambulance driver reported his concerns about Allen's driving.[3] He also identified the Denton County exits that he passed while following Allen's vehicle northbound on I-35E and told the 911 dispatcher that Allen's speed fluctuated

---

[3]Allen does not complain on appeal about the trial court's overruling his objections to the admission of the 911 recording.

4

between 10 miles per hour and 75 miles per hour, that Allen had been "all over the road" and "swerving side to side pretty good" in his lane, and that Allen had been crossing over the line.

Denton Police Officers Scott Owen, Cory McConnel, and Travis Nicholas testified that dispatch had received the 911 call at around 9 p.m. and that other officers had already stopped Allen by the time they met him at a gas station at the Valley View exit in Cooke County. The trial court admitted into evidence the officers' dashboard and body camera footage.

The video footage showed that Allen had trouble following the directions to exit his vehicle and that he got tangled up in his seatbelt when he tried to get out of the car. Once Allen successfully emerged from his vehicle, he chatted animatedly with the police, making frequent hand, arm, and body gestures while they led him to a clear area away from the assorted patrol vehicles.[4] Allen told Officer Nicholas about his conversation with the ambulance driver, who had tried to check on him,[5] and

---

[4]The stop of Allen's vehicle was a felony traffic stop, with numerous police units in attendance and police officers aiming weapons at his vehicle.

[5]During the 911 call, the ambulance driver told the dispatcher that he had pulled the erratic driver over to ask if anything was wrong but that the driver could not understand anything he was saying, so he had continued to follow him and called 911.

5

explained that he had not known that the police were pursuing him when he stopped at the gas station.[6]

Allen told Officer Nicholas that he and his friend had stopped for gas, but when Officer Nicholas asked, "Where's your friend?" Allen said, "I'm here by myself." The video footage showed that no one else was in the vehicle with him at the time of the stop.

Allen had a difficult time answering questions about where he was coming from—even after he was given prompts, such as "a house, a restaurant?"—and where he was going. Allen, who told the police that he lived in North Dallas, finally said, "I had been driving" and had been going to get gas. He continued to move around and gesticulate during the conversation. Officer McConnel said that sober people can normally answer such simple questions with relative ease but that Allen struggled. The dashboard and body camera footage supported Officer McConnel's testimony.

The officers asked Allen whether he had any health conditions, whether he was under a doctor's care, whether he was taking any prescription medication, and whether he could walk or stand normally. When Officer Nicholas asked Allen if he had consumed any alcohol or illegal drugs that evening, Allen denied that he had consumed any. He told the officers that he took Benadryl and Risperdal "to calm

---

[6]One of the dashboard videos shows that at the time Allen's vehicle exited the interstate, he was being followed by at least two police vehicles with lights and sirens, as well as a red ambulance.

[him] down" but that he was not under a doctor's care. Allen also told them that he had been diagnosed with bipolar schizophrenia and depression and that he had taken his medication the day before.[7] Allen told Officer Nicholas that he heard voices and music. Officer Nicholas said that, with regard to voices, Allen could have been talking about hearing the other police officers at the scene, but Officer Nicholas did not recall hearing any music.

Officer Nicholas administered standardized field sobriety tests[8] to Allen, who had difficulty following the test directions. Officer Nicholas stated that he tried to conduct the HGN test first but gave up after several attempts because Allen "could not focus on [the] stimulus and . . . his concentration kept drifting away." During the

---

[7]When defense counsel questioned Officer Owen about the distinction between intoxication—lacking normal mental or physical faculties as evidence of intoxication—and mental illness, Officer Owen clarified that he did not think that lacking the normal use of mental faculties because of a mental health condition qualified as being intoxicated.

[8]Officer Nicholas said that under normal circumstances, a person should be able to perform the tests—used to test balance and cognitive skills for signs of intoxication—with no complications. He described the horizontal gaze nystagmus (HGN), walk-and-turn, and one-leg stand tests and stated that a person's meeting a minimum number of clues from each test would result in a conclusion that the person was intoxicated. The walk-and-turn and one-leg stand tests were "divided attention" tests, in which the subject is asked to perform a series of actions to test his memory and performance ability. The walk-and-turn test requires the subject to walk in a straight line by taking nine heel-to-toe steps while keeping eyes focused on the feet and counting the steps aloud; it can result in up to 8 clues, with a decision point of 2 clues. The one-leg stand test requires the subject to lift a foot six inches off the ground and count until instructed to stop; it can result in up to 4 clues, with a decision point of 2 clues.

HGN test, Allen complained that his feet were tired and asked to take his shoes off, which the police allowed him to do.

Before the walk-and-turn test, Allen asked to put his shoes back on, which the police also allowed him to do. Allen's performance on the walk-and-turn test resulted in 4 clues indicating possible intoxication, and his performance on the one-leg stand test resulted in 2 clues. Officer Owen, who was certified as a field sobriety test practitioner, noted Allen's inability to perform the walk-and-turn test and to maintain his balance while trying to perform the one-leg stand test: "[T]he subject did not stand on one leg. Instead, he basically was marching."

Officer McConnel said that signs that someone may be intoxicated on a stimulant included erratic behavior, profuse sweating, and the inability to stop moving, and Officer Owen described Allen's behavior during the stop as consistent with having ingested methamphetamine. Officer Nicholas testified that he had ruled out alcohol as the cause of Allen's intoxication and attributed it to some type of drug. All three officers described Allen as sweating profusely, making jittery, twitchy, and fidgety movements, and being unable to focus or relax. Officer Owen further noted that both driving on I-35E at speeds varying from 10 to 75 miles an hour and swerving side to side within a lane and over lanes could indicate intoxication. Based on the totality of the investigation, Officer Nicholas concluded that Allen was

8

intoxicated, placed Allen under arrest,[9] and obtained his consent to give a blood specimen.[10]

Officers McConnel and Nicholas observed the phlebotomist, Crystal Horner, perform Allen's blood draw at the hospital. Kimberly Sutton, the hospital's laboratory manager at the time of trial, testified that Horner, who had worked at the hospital for two years under her supervision, no longer worked there. Sutton said that Horner had been a qualified technician to collect blood and stated that a phlebotomist was only required to have a high school diploma and to complete two weeks of on-the-job training in logistics because "they come usually knowing how to collect blood already." Sutton, who was not present for Allen's blood draw, said that she was not "privy to" the circumstances of Horner's departure from the hospital. The body camera footage showed Horner draw the blood in the tubes provided by the officers and hand the blood samples to Officer Nicholas, who shook them to make sure the anticoagulants and preservatives contained therein were well-distributed. The body camera footage of Allen at the hospital showed that he had become calm and very quiet by that time.

---

[9]Allen incurred additional charges arising out of the same incident that were tried separately—possession of a controlled substance and evading arrest or detention with a vehicle.

[10]Officer Nicholas had to ask Allen several times for a clear answer to the blood draw inquiry because Allen was mumbling under his breath.

Sheryl Peyton, a forensic toxicologist with the Texas Department of Public Safety, testified that she had tested Allen's blood sample. Defense counsel objected to the admission of the blood kit and Peyton's toxicology report—State's Exhibits 8 and 9, respectively—arguing that the State had failed to provide a proper predicate for the blood draw with regard to the phlebotomist's qualifications, among other things, but the trial court overruled Allen's objections and admitted the exhibits into evidence.

Peyton then testified that Allen's blood had tested positive for methamphetamine at .21 milligrams per liter. She also testified, over defense counsel's objections, about the effect of methamphetamine on the body.[11] Specifically, Peyton testified that at levels of .01–.05 milligrams per liter, one would see a focused and euphoric individual with an ability to stay alert but that once the methamphetamine level rose above the therapeutic range, "you get different reactions: jittery, talkative, extremely talkative, inability to focus." In terms of driving behavior, Peyton said that a driver on methamphetamine would be "consistently driving over the median and over the side on the shoulder," slowing down, and speeding up. And if the driver was "on their way down" from a high, the methamphetamine would act as a depressant, making the individual seem extremely lethargic.

---

[11]Allen does not complain on appeal about the admission of this testimony.

10

Defense witness Charlie Foster, a former-police-officer-turned-consultant,[12] testified about his training in DWI detection and the standardized field sobriety tests. He stated that the National Highway Traffic Safety Administration had hired the Southern California Research Institute (SCRI) to develop the standardized field sobriety tests in the 1970s, that SCRI was the only entity to have validated the tests, and that SCRI only validated the tests for the detection of alcohol, not impairment by narcotics. He opined that someone with a mental condition, such as a bipolar schizophrenic who had not taken his medication, "certainly could have a difficulty -- a very difficult time learning" the tests. Foster reviewed the police report and Officer Nicholas's testing, noted that the police had indicated that Allen's eyes were "normal," i.e., not dilated, and he stated that if a person were under the influence of methamphetamine, his pupils would be dilated. On cross-examination, Foster described the signs of intoxication by methamphetamine as including excitedness, exaggerated reflexes, alertness, and talkativeness.

## C. Jury Charge

The jury charge defined "intoxicated" as "not having the normal use of mental or physical faculties by reason of the introduction of a controlled substance, a drug, a dangerous drug, or a combination of two or more of those substances into the body"

---

[12]Foster had been a police officer in North Texas for 28 years—with the last several years exclusively in DWI enforcement—before beginning his twelve-year consulting career.

11

and informed the jurors that to find Allen guilty, they had to find that he operated a motor vehicle in Denton County on or about July 26, 2017, that he did so in a public place, and that he did so while intoxicated, but the jury did not have to agree on the method of intoxication.

## D. Closing Arguments

During closing arguments, the prosecutor argued that the State had proven all of the DWI elements and that the jury should consider Allen's behavior in the videos, confirmed by the lab report, to conclude that he had been intoxicated. She also argued that the jury should consider the 911 caller's recitation of the places he and Allen passed in Denton County and Allen's admission on the video that the 911 caller had stopped him for a wellness check for proof that Allen had committed the offense in Denton County.

The prosecutor referred the jury to the officers' descriptions of Allen as consistent with intoxication caused by methamphetamine: "The sweating, the inability to follow instructions, not having any concentration, those driving behaviors . . . 10 miles an hour, 55 miles an hour, 65 miles an hour, 75 miles an hour, all over the road. Not only consistent with methamphetamine but just consistent with someone who is intoxicated." The prosecutor also argued that Foster, as a defense expert, would always have some explanation regarding why someone might have symptoms of intoxication but not be intoxicated.

Defense counsel responded that "[t]his would be a fairly decent [DWI] case if it was being tried in Cooke County" and argued that the State had failed to prove that Allen had operated a motor vehicle in Denton County because none of the testifying witnesses saw him drive in Denton County. He argued, "What my client is guilty of is driving an automobile in Cooke County while he is bipolar schizophrenic and off his meds." He argued that there was no evidence of alcohol and "really no evidence of intoxication on methamphetamine" because the phlebotomist did not testify. He also argued that the results of the standardized field sobriety tests did not matter when they were not certified to test anything besides intoxication by alcohol.

In rebuttal, the prosecutor told the jury to consider the 911 recording to determine that the State had met its burden to prove that Allen had committed a DWI in Denton County and to consider Allen's behavior while driving and while interacting with the police, coupled with his lab test, to find that he had been intoxicated.

**E. Analysis**

Based on our review of the record as a whole, we conclude that the trial court's admission of the blood test results over Allen's objection to the phlebotomist's qualifications did not adversely affect Allen's substantial rights. The jury heard the 911 recording that Allen had driven over lines and at an inconsistent velocity while on I-35E and saw firsthand evidence of Allen's behavior—jittery, talkative, and unfocused initially and then lethargic at the hospital—from the officers' dashboard

13

and body camera footage, all of which matched both Officer Owen's and Peyton's testimony about the effects of methamphetamine on a person. The jury was therefore entitled to disbelieve Allen's assertions to police in the recordings that he had not consumed any illegal drugs and, even without the blood test results, the jury could have found that Allen's behavior reflected intoxication—and, specifically, methamphetamine intoxication—rather than mental illness. Accordingly, we overrule Allen's sole point.

## III.  Conclusion

Having overruled Allen's sole point, we affirm the trial court's judgment.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered:  October 29, 2020